David LEWIS, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of Social Security, Defendants.

Cause No. 3:01cv0403 AS.

United States District Court, N.D. Indiana, South Bend Division.

March 19, 2002.

Eric Schnaufer, Evanston, IN, for plaintiff.

Clifford D. Johnson, Assist. U.S. Atty., South Bend, IN, for defendants.

### MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

This cause is before the Court because the Plaintiff, David Lewis, appeals the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423(d), and supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1382, and 1382c. Jurisdiction over Lewis's petition for judicial review is conferred on this Court by 42 U.S.C. § 405(g). In accordance with Local Rule 7.3, this matter is deemed to be before the Court on cross-motions for summary judgment. The Court has carefully considered the submissions of the parties and the 375 page record in this case, and now rules as follows.

### I. PROCEDURAL HISTORY

On October 27, 1994, Lewis filed for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d), and for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1382 and 1382c, claiming disability dating back to February 21, 1993, due to severe back and neck impairments. R. at 43–45. The state agency denied his application initially and on reconsideration. Pl.'s Brief at 1. A hearing was held before an administrative law judge (ALJ) on October 10, 1996, at which Lewis appeared without counsel. *Id.* The ALJ heard testimony from Lewis and from a vocational expert. *Id.* at 2. On December 11, 1996, the ALJ ruled that Lewis was disabled from February 21, 1993 until October 6, 1994, but not thereafter. *Id.* He was therefore entitled to DIB payments for the period from February 21, 1993, to October 6, 1994, but not for SSI. Id. The ALJ determined that Lewis was ineligible for SSI benefits because his closed period of eligibility ended prior to the date on which he filed his application for SSI. ALJ Decision at 8.

Lewis filed for review of the ALJ's Decision, but his review was delayed because the record upon which the decision was based could not be located. Pl.'s Br. at 2, R. at 369. On March 20, 2000, this case was remanded to the ALJ for a new hearing because the Appeals Council was unable to locate or redevelop the evidence, but the file was finally located, and, on October 24, 2000, the case was returned to the Appeals Council. R. at 372. Finally, on April 5, 2001, the Appeals Council de-

nied Lewis's request for review, thus adopting the ALJ's opinion as the Commissioner's final decision, and Lewis appealed to this Court. *Id.*

## II. FACTUAL BACKGROUND

### A. Evidence Presented to the ALJ

At the time of his application, Lewis was thirty-two years old. Pl.'s Br. at 3. He was a high school graduate with work experience as a circuit board assembler, mechanic, and railroad car switch man. *Id.* At the time of the hearing, Lewis lived in Michigan City, Indiana, with his wife and two children, ten year old twins. *Id.* In 1990, Lewis was in an automobile accident and suffered a whiplash injury. R. at 179.[1] He was off work for three months. Then, on February 21, 1993, Lewis was injured at work when he fell on icy concrete stairs and injured his lumbosacral spine. Pl.'s Mem. at 3. An x-ray showed that he had an acute fracture to the left L4 transverse. R. at 97.

On October 15, 1993, Lewis was still experiencing low-back pain, left leg and bilateral foot pain. R. at 9598. A lumbar discogram showed a degenerated disc at L4, and 40 mg of Depo Medrol was injected. *Id.* at 96. On November 26, 1993, Lewis's treating physician, Dr. John Collis,[2] a specialist in Orthopaedics and Neurosurgery, reviewed the discogram and recommended conservative treatment. *Id.* at 102. Lewis continued to experience severe pain, and on March 21, 1994, Dr. Collis performed surgery consisting of a lumbar laminectomy and L4 total disc replacement using bank bone. R. at 99 and 102. A follow-up exam with x-rays by Dr. Collis on May 19, 1994 showed "fine heal-

ing in the area of the decompression and interbody fusion." *Id.* at 105. Dr. Collis recommended that Lewis wear a brace for a total of four months, then begin work-hardening exercises. *Id.*

On August 2, 1994, Lewis went to a hospital emergency room complaining of significant pain in his neck with radiation into his left arm. R. at 109. On August 4, Dr. Collis performed cervical spine surgery on Lewis, including cervical discectomies and interbody fusions at C4, C5, and C6. He was given instructions to "Wear a Miami collar for 2 to 4 months, no driving for two months, and no strenuous exertions." *Id.* at 107.

On October 4, 1994, two months after the second surgery, Dr. Collis examined Lewis and reported that the majority of his cervical pain symptoms had been relieved, however, he still had interscapular pain, and pain in the groin area. R. at 128. He noted that the cervical x-rays "look excellent", that all three grafts are "in site and healing well", and that the x-rays of his lumbar surgery also look excellent. *Id.* On October 7, 1994, Dr. Collis advised Lewis that he should have a local interscapular injection at the trigger point. *Id.* at 127. He also advised that it was okay to drive, to wear his collar for three months, and no strenuous activities. *Id.* It was not advised that Lewis increase all his activities to his tolerance at that time. *Id.* at 128. Dr. Collis informed Lewis that he should be able to return to his usual work on February 7, 1995. *Id.*

Dr. Collis examined Lewis again on December 27, 1994. He noted that Lewis's cervical x-rays showed "three perfect disc

---

1. Although the ALJ's Decision states that the car accident was in 1980, the hearing testimony from Lewis indicates that it was in 1990. See, Tr. at 5.

2. Dr. Collis was with the Cleveland Spine & Arthritis Center in Cleveland, Ohio. The record does not say why Lewis, who lived in Michigan City, Indiana, chose Dr. Collis for treatment of his back injury.

replacements with solid interbody fusions." R. at 123. The lumbar fusion also looked excellent, with the one weak area he had completely replaced by bone. *Id.* He stated that Lewis was having much less pain in his neck and arms, but still complained of abdominal pain, and recommended that he see his family doctor or an appropriate specialist. *Id.* Dr. Collis recommended more vigorous work hardening exercises, but only after consultation about the groin-abdominal pain. *Id.* He noted that Lewis should be able to return to his regular work by May 1, 1995.

On January 5, 1995, Dr. Collis wrote Lewis an additional letter regarding his December 27 examination, in which he told Lewis that he no longer needed to wear a collar or brace. R. at 122. Dr. Collis told Lewis that he could go back to work if he could find light work. *Id.* For very strenuous exertion or heavy work, however, Lewis should wait until May 1, 1995. Dr. Collis again recommended work hardening exercises. *Id.*

On May 25, 1995, Dr. Collis examined Lewis again. R. at 118. Lewis told Dr. Collis at the time that he was having more pains than he could possibly tolerate, that he felt unable to stand for prolonged periods of time, unable to bend, to lift, etc., and that the most relief came from lying down. *Id.* However, Dr. Collis had examined Lewis' CT scanning, and found that the x-rays looked very good, with no signs of any new disease. *Id.* at 119. He found that the lumbar area looked perfect, and that the L4 area was solid. *Id.* In addition, he noted that the cervical x-rays looked quite good, with the C4 and C5 fusions completely solid. He noted that the C6 was "semi-solid" in that the anterior part was solid, but the back part still had some scar tissue. *Id.* It was Dr. Collis' opinion that Lewis would not need additional surgery, and that the C6 should

be solid within the next year or two. *Id.* Dr. Collis advised that Lewis could return to work any time, and that he might possibly be able to do the same work he had done in the past. *Id.*

During this same time period, Lewis started going to Doctor Paul Madison, M.D., at the Midwest Pain Clinic in Michigan City complaining of sharp pain and numbness in both shoulders radiating between the shoulder blades, more to the left than to the right. R. at 156. A Thoracic Spine MRI was performed on February 14, 1995, and found to be normal. *Id.* On April 10, 1995, a Cervical MRI with no paramagnetic enhancement was performed. *Id.* at 158–9. The report indicates that Lewis had a borderline narrow anterior posterior dimension of the spinal canal between C5–6 and C6–7 down to 1cm, but with no current disc or spur impingement of the otherwise well preserved cervical canal and traversing nerves. *Id.* The doctor also observed static moderate to severe C5–6 and C6–7 exiting neuroforamen fat narrowing from degenerative disc and possible spur. *Id.*

On April 12, 1995, Dr. Madison wrote a cervical spine flexion and extension report which indicated solid fusion of the 4th, 5th and 6th cervical vertebral bodies, but incomplete fusion of the 6th and 7th vertebral bodies. *Id.* at 157. The report states that there is "possible narrowing of the anterior C6–7 vertebral body fusion on one of the flexion lateral views raising the possibility of instability of the C6–7 vertebral body fusion. Otherwise the rest of the study is unremarkable." *Id.* On April 18, 1995, Dr. Madison noted that a study of the lumbar spine with flexion and extension lateral views indicated that there was a continued narrowing of the L4 L5 intervertebral disc space with a posterior anterior osteophyte which may be due to a

partial fusion. *Id.* at 160. The remainder of the disc spaces appeared normal. *Id.*

On November 16, 1995, and again on October 9, 1996, Dr. Madison diagnosed Lewis as having both cervical and lumbar arachnoiditis with intractable pain. R. at 293 and 173. Dr. Madison recommended that Lewis avoid lifting more than twenty pounds, walking more than 100 feet, prolonged standing or sitting, and strenuous repetitive activity. R. at 173.

On December 13, 1995, Dr. Madison referred Lewis for nerve testing. *Id.* at 161–165. At the time, Lewis was complaining of pain in his lower back, hip and buttock on the left, radiating down into his left leg, worse below the knee, and pain in his big toe. *Id.* at 161. In addition, he complained of severe neck pain radiating down the left shoulder with tingling in the left arm, and a stabbing pain between the shoulder blades. *Id.* Dr. J.A. Arnold, the neurologist that performed the testing, reported that Lewis had abnormal electrodiagnostic results on somatosensory tests for both the upper and lower extremities, but that nerve conduction studies were essentially within normal limits. *Id.* Lewis exhibited somatosensory abnormalities, dermatomal abnormalities, and an abnormal H-reflex. *Id.* at 163. Dr. Arnold stated that these results were compatible with functional impairment of the neural pathways, with soft tissue injury, or possibly radiculopathy. *Id.*

On January 24, 1996, Lewis had a psychological evaluation, performed by Dr. Kenneth Hanig, Ph.D., at the request of Lewis's attorney at the time, O. Jerrold Winski. R. at 166. Dr. Hanig and Dr. Timothy A. Onkka, Ph.D., administered thirteen different tests. *Id.* A summary of the results indicates that Lewis was functioning in the Average range of overall level of ability for a person of his age. *Id.* However, he seemed to have some mild to moderate attentional deficits, as well as difficulty with visual tracking. *Id.* His nonverbal visual reasoning skills were intact, as well as overall levels of visual tracking. *Id.* However, significant impairments were noted in memory, as well as spelling. *Id.* Although Lewis tested at high school level for reading, his spelling skills were at the fifth-grade level, and his math computations at the eighth-grade level. *Id.* Finally, the doctors noted some difficulties with emotional functioning which were diagnosed as "depression, recurrent, secondary to injury." *Id.* at 171. It was recommended that Lewis get vocational counseling. *Id.* The report also states, "I think it quite imperative that he participate in individual and/or group counseling in order to help him cope with his physical disabilities as well as the emotional characteristics associated with it." *Id.* at 172.

## B. Lewis' Hearing Testimony

Lewis appeared without counsel at the hearing. The ALJ asked Lewis if he had thought about having an attorney. Lewis said no, because he thought with all his medical records, "that's something I could do on my own." R. at 21. The ALJ asked if he had ever had an attorney, and Lewis answered that he had once, for an auto accident claim. *Id.* The ALJ then asked, "So you'd like to go ahead today without an attorney?" *Id.* When Lewis answered yes, the ALJ went on to other things. *Id.*

At the hearing, Lewis testified that he still had pain in his neck that caused headaches, pain in both shoulder blades, muscle spasm, and pain radiating all the way down his thoracic spine causing stabbing pain in his spine area between the shoulder blades. R. at 27. In addition, he had pain in his lower lumbar area, in the left lumbar area, radiating into his buttock and left leg, and occasionally pain in his pelvis.

*Id.* He testified that the lumbar surgery helped some, that he no longer had a severe, stabbing pain in the center of the spine where the disc was herniated. *Id.* at 29. Lewis testified that the cervical surgery also helped some because before the surgery, he couldn't even use his left arm. *Id.* He stated that he regained use of his arm, and had some relief from the severe pain in his neck, but that he thought the surgery caused additional problems, and that his condition had deteriorated since the surgery. *Id.* at 29–30. He stated that the epidural injections Dr. Madison gave him also helped, but they would wear off in a few months. *Id.* at 30. He was currently taking several medications: Zestril for high blood pressure; Zocor for cholesterol; Lodine for spinal inflammation and swelling; Flexeril; and extra strength Vicodin for pain management. *Id.*

Lewis testified that his daily activities included occasionally helping with the cooking or the dishes, getting the children off to school, watching television, and watching his son's soccer games. *Id.* He stated, however, that he sometimes watched the games from his car because it was more comfortable than sitting in the stands or in a lawn chair. *Id.* He also testified that he helped his wife with the shopping, and could lift light items or light bags of groceries, but tried not to because is aggravated his back. *Id.* at 34. He also tried to help with things around the house, but if he did too much, he had to lay down. *Id.* at 35–6. He said he did not take naps, but that he would lay down a lot because it helped his back and enabled him to make it through the day a little better. *Id.* at 36. Lewis said that he used to love playing golf, but that he could no longer play. *Id.* at 32. He said he could only stand for ten or fifteen minutes at a time. *Id.* at 35. He also attended church. *Id.*

## C. The Vocational Experts Testimony

Dr. Dennis Fisher, a psychologist with expertise in vocational rehabilitation, appeared and testified at the hearing as a vocational expert. Def.'s Mem. in Supp. at 6. The ALJ posed two hypothetical situations for Dr. Fisher to give his opinion as to whether there were a significant number of jobs in the regional economy for a person with those limitations. The first hypothetical asked Dr. Fisher to consider someone who doesn't have the ability to lift more than 20 pounds, and who would be limited to walking no more than 100 feet at one time and who would have to avoid prolonged standing or sitting or a strenuous repetitive activity, especially involving the upper body. R. at 37. For purposes of the hypothetical, prolonged would mean more than half an hour. *Id.*

The second hypothetical imposed greater restrictions on the person's ability to sit and stand, and appears to be the one the ALJ relied upon for his decision. In it, he asked Dr. Fisher to consider

"an individual can walk three to four blocks, stand for between (sic) 20 minutes occasionally. This person could sit for approximately an hour without needing to stand and move around. This person could lift and carry 15 pounds occasionally. And assume by the way (sic) would be only occasionally that person would need to change postures more frequently in that, but he could sit for as much as an hour." *Id.* at 39.

The ALJ added that the person would not be able to work in an assembly line because of the need to perform tasks at a certain rate, which the person could not do because of the need to vary posture and "move away from the certain activities." *Id.* at 40. The vocational expert testified that this person would not be able to do any of Lewis's past relevant jobs, but that he could do other jobs. Specifically, Dr.

Fisher testified that in the Michigan City area, there were approximately 4,071 assembly jobs in the light sit/stand category, and that a person with the stated limitations could do about 15 percent of them. He could do about 15 percent of the 2,830 inspecting jobs available (424 jobs), about 30 percent of the 2,571 self-service gas station attendant positions (771 jobs), about 20 percent of the 7,540 cashier jobs (1,508 jobs), and about 15 percent of 2,080 unarmed guard positions in the region (312 jobs). In addition, there were about 100 surveillance system jobs, and about 30 parking lot attendant jobs that could be performed with these limitations.

When asked if he had any questions for the vocational expert, Lewis expressed concern about his psychological report, that he had trouble with visual tracking and attentional deficits, and also that his medications make it hard for him to concentrate. R. at 40–41. He said that between his pain and the medication, "it's tough." *Id.* In addition, he stated that the reports showed that he had a memory deficit. The ALJ then discussed the results from the psychological testing, but he only discussed one test, the Kaufman test, and added to the hypothetical that the individual had a score of 90 with a plus or minus of five, which the vocational expert noted was in the average range. *Id.*

### D. Additional Evidence Submitted to the Appeals Counsel

When Lewis appealed the decision of the ALJ to the Appeals Counsel, he included additional medical evidence that was not a part of the record before the ALJ. The additional evidence includes mostly records from Dr. Madison. It shows that throughout 1995, Dr. Madison treated Lewis's back and neck pain with epidural nerve block injections. R. at 211–27, 231–45, 259–307 (showing epidural injections on

December 31, 1994, April 4, 1995, September 19, 1995, and November 16, 1995; and "neurolysis lumbar" on August 15, 1995). In addition, it shows that Dr. Madison diagnosed Lewis as having intractable radiculitis and neuropathy, R. at 211, and eventually as having chronic cervical and lumbar arachnoiditis from a failed back. R. at 261, 291–93. Lewis also submitted Dr. Madison's progress notes, which show that he had done physical therapy. R. at 313, 318–22.

In addition, Lewis submitted a report from Dr. Collis of an exam performed on January 15, 1997. R. at 359. He stated that x-rays of the cervical and lumbar areas looked excellent. *Id.* He also noted that a new MRI showed no significant bulges, no signs of congenital anomalies, etc. *Id.* at 358. He noted that the spinal canal was open in both the cervical and lumbar areas. *Id.* However, he noted that Lewis had a degenerative spinal condition, plus injuries, plus surgery in both the lumbar and cervical areas. *Id.* He stated, "I recommend that you avoid all heavy work or any work with prolonged standing or sitting. For the past 2½ years, you have attempted lighter activities and this has always met with extreme pain. I would suggest that you be declared totally and permanently disabled." *Id.* The report from Dr. Collis also notes that Lewis's past outpatient treatment had included six to eight weeks of work hardening and physical therapy, which aggravated his symptoms. *Id.* at 360. In addition, he had had several trigger point injections in the neck and should blades, which "help but do not last," and that he had taken the anti-inflammatory medication Lodine in the past. *Id.*

The additional materials submitted to the Appeals Counsel also included a note from Dr. Madison dated February 7, 1997, stating that Lewis had been under his care

since December, 1994, and that he "has not been released to do any kind of work since then." R. at 367. Dr. Madison said that he expected to continue treating Lewis for his chronic pain with anti-inflammatory, muscle relaxant, and pain medication. *Id.*

## III. STANDARD OF REVIEW

The Social Security Act itself provides the appropriate standard of review, stating that "the findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The ALJ's finding that Lewis is not disabled must be upheld if it is supported by substantial evidence in the record. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Powers v. Apfel,* 207 F.3d 431 (7th Cir.2000) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). A federal court reviewing the Commissioner's decision is not free to decide the facts anew, re-weigh the evidence, or substitute its judgment for that of the Commissioner to decide whether a claimant is disabled under the statute. *Id.*

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(D). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, en-

gage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

In determining disability status, the Commissioner uses a five-step inquiry set forth in the Social Security regulations guides. *Allen v. Sullivan,* 977 F.2d 385 (7th Cir.1992). The Commissioner must consider the applicant's claim in the following sequence: (1) whether the claimant is currently employed; (2) whether she has a severe impairment; (3) whether her impairment meets or equals one listed by the Commissioner; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing any work in the national economy. *Id.* The initial burden is on the claimant to show that she suffers from a "severe impairment" that prevents her from performing her past work. *Walker,* 834 F.2d at 640.

If the claimant meets this burden but does not have a listed impairment, the burden shifts to the Commissioner to demonstrate that the claimant retains sufficient "residual functional capacity" to perform other work available in the national economy. *Id.* If the claimant has only exertional[3] limitations, the Commissioner may satisfy this burden by applying the Medical Vocational Guidelines, commonly called the grid. *Allen,* 977 F.2d at 388. If, however, the claimant has non-exertional[4] impairments, and those impairments

---

**3.** Exertional limitations are defined in the regulations as those which affect only the claimant's ability to meet the strength demands of a job, such as sitting, standing,

walking, lifting, carrying, pushing, and pulling. 20 C.F.R. § 404.1569a(b)(1999).

**4.** Non-exertional limitations are those which affect only the ability to meet job demands

are severe enough, use of the grid is not appropriate. *Id.* (citing *Walker v. Bowen,* 834 F.2d at 641).

If the Commissioner determines that the claimant was disabled for a period of time, and the question is whether he continues to be disabled, then a slightly modified eight-step evaluation is performed. *See,* 20 C.F.R. § 404.1594(f); *see also, Jones v. Shalala,* 10 F.3d 522 (7th Cir.1993). For continuing disability, if the Commissioner determines that the claimant's impairment no longer meets or equals the severity of one listed in the Appendix, then the next question is whether there has been medical improvement[5] as shown by a decrease in medical severity. 20 C.F.R. § 404.1594(f)(3); 42 U.S.C. § 423(f).[6] If there has been medical improvement, the Commissioner must determine if it is related to the claimant's ability to do work, for example by determining if there is an increase in the claimant's residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination. *Id.* at (4). If there has been no medical improvement, or if the medical improvement was not related to the ability to work, and if none of the statutory exceptions apply, the

claimant's disability will be found to continue. *Id.* at (5).

If medical improvement is shown to be related to work, the Commissioner must determine whether all the claimant's current impairments in combination are severe, and if so, do they significantly limit the ability to do basic work activities. Id at (6) and (7). The last two steps involve determining whether the claimant has the ability to engage in "substantial gainful activity, but looking at whether he can still do the work he did in the past, and if not, whether he has the residual functional capacity considering his age, education and past work experience to perform other work." *Id.* at (7) and (8).

## IV. DESCRIPTION OF THE ALJ'S FINDINGS

Applying this five-step analysis to Lewis's claim, the ALJ determined that Lewis was disabled for purposes of Title II from February 21, 1993, until October 6, 1994 because his back impairment met the criteria for Listing 1.05C. ALJ's Decision at 9. After October 6, 1994, the ALJ determined that Lewis experienced "medical improvement" and that his surgery was successful. *Id.* As a result, he no longer had an im-

---

other than strength demands and include: difficulty functioning because of nervousness, anxiety, or depression; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; and difficulty performing manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching. 20 C.F.R. § 404.1569a(c)(1)

**5.** The Social Security regulations define medical improvement as "any decrease in the medical severity of [the claimant's] impairments which [were] present at the time of the most recent medical decision that [the claimant] was disabled." 20 C.F.R. § 404.1594(b)(1) (1992).

**6.** A recipient of benefits ... may be determined not to be entitled to such benefits on the basis of a finding that the physical or mental impairment on the basis of which such benefits are provided has ceased, does not exist, or is not disabling only if such a finding is supported by—

(1) substantial evidence which demonstrates that—

(A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and

(B) the individual is now able to engage in substantial gainful activity; ...
42 U.S.C. § 423(f).

pairment or combination of impairments that met or equaled a listing since October 6, 1994. *Id.*

For the period after October 6, 1994, the ALJ determined that the Lewis's statements concerning his impairment and its impact on his ability to work were not entirely credible. *Id.* The ALJ also found that Lewis was restricted to lifting and carrying [no] more than 10–15 pounds,[7] that he was unable to perform his past relevant work, and that his ability to perform the full range of light work was diminished by his inability to walk more than three to four blocks; that he can "stand for 15–20 minutes occasionally, sit for 1 hour occasionally, and is to avoid a regimented pace." *Id.* In addition, he found that Lewis was a "younger individual," had a high school education, had skilled and semi-skilled work experience, but no transferable job skills that he remained capable of performing. *Id.* Based on the testimony of the vocational expert, the ALJ found that, although Lewis was unable to perform the full range of light work, he was capable of making an adjustment to work which exists in significant numbers in the national economy. *Id.* As a result, the ALJ found that Lewis had not been disabled since October 6, 1994 for purposes of Title II or XVI. This finding also meant that Lewis was not eligible for SSI for the closed period that he was disabled, because he was no longer disabled as of October 27, 1994, when he filed his application for benefits.

## V. ISSUES PRESENTED ON REVIEW

Lewis challenges the ALJ's decision on multiple grounds, arguing first of all that,

although the ALJ used the correct five-step analysis in determining that Lewis was disabled from February 23, 1993 to October 6, 1994, he did not use the eight-step evaluation in determining that Lewis was no longer disabled after that date. He argues that, after finding that Lewis was entitled to benefits at all, the correct analysis to use to terminate those benefits was the eight-step evaluation found in 20 C.F.R. § 404.1594(f). He also argues that the ALJ made inconsistent findings that render his decision unreviewable; that his hypothetical was defective because of a number of errors, that his decision is not supported by substantial evidence; that he did not elicit a valid waiver of Lewis's right to an attorney; that the ALJ did not develop an adequate record; and that the additional evidence presented to the Appeals Counsel warrants a remand for a new hearing. The Commissioner argues that these are technical errors that do not affect the fundamental question on review, whether the ALJ's decision is supported by substantial evidence in the record. The Commissioner points out that the crucial evidence in this case is the medical evidence, which substantially supports the ALJ's determination that Lewis was not disabled after October 6, 1994.

## VI. DISCUSSION

While the Court may agree that the arguments raised by the Plaintiff in this case are technical arguments, the Court notes that the Social Security Act and its supporting regulations are technical in nature. Lewis's arguments deserve careful consideration, especially in light of the fact that he waited almost five years to get an

---

**7.** The ALJ's findings actually states "the claimant has been restricted to lifting and carrying *more* than 10–15 pounds" (ALJ Decision at 9), but in his opinion, he says the evidence supports finding that "he is *not able*

to lift and carry more than 10–15 pounds" (*Id.* at 7), therefore, the Court assumes that the findings contain a typographical error, and should read "*no more* than 10–15 pounds."

answer from the Appeals Counsel on his request for review. The Court will discuss first the proper test to use, then the ALJ's findings, the hypothetical and the vocational testimony, then whether the decision is supported by substantial evidence, and finally whether Lewis's waiver of representation by counsel was valid.

## A. The Eight Step Sequential Evaluation

■ Although the case law is limited on the subject, the situation in *Jones v. Shalala*, 10 F.3d 522 (7th Cir.1993), appears to be directly on point. In that case, the claimant applied for disability benefits in March, 1988. The ALJ determined that the claimant was disabled because of an accident from June 2, 1986 until July 2, 1988, the day his treating physician recommended that he discontinue outpatient therapy and continue on a home therapy program. *Jones*, 10 F.3d at 524. Although the claimant never regained use of his right hand, the ALJ applied the eight-step sequential evaluation to determine that the claimant was medically improved, that the improvements related to his ability to do work, and that he was able to engage in other substantial gainful employment despite his limitations. *Id.*

In this case, it appears that the ALJ used the five-step evaluation to determine that Lewis had a severe impairment, chronic back pain, on October 10, 1996, the date of the hearing, but at that time, it did not meet or equal a listed impairment. ALJ's Decision at 2, 9. The ALJ determined that prior to October 6, 1994, Lewis had the symptoms of listed impairment 1.05(C), but noted, "He received staged surgeries and recovered by that date." *Id.*

Next, the ALJ considered whether, despite his impairment, Lewis had the residual functional capacity to perform work that existed in significant numbers in the national economy. *Id.* at 10. The ALJ found that Lewis was able to perform a limited range of light work, that sufficient jobs existed that he was capable of performing, and that he was therefore not disabled after October 6, 1994. *Id.*

Although the ALJ mentioned "medical improvement", it does not appear that he used the eight-step evaluation from 20 C.F.R. § 404.1594(f). For example, he did not mention whether the medical improvement was related to Lewis's ability to perform work. However, in finding number 5, the ALJ stated, "The claimant experienced medical improvement. Specifically, his surgery was successful." *Id.* at 9. Therefore, even though the ALJ did not precisely follow the order of the eight-step evaluation for closed periods of disability, this statement and his analysis of Lewis's residual functional capacity indicates that the ALJ considered whether Lewis's medical improvement was related to his capacity to work. The Court concludes that the ALJ's decision, although not in the correct form, contains adequate information and analysis to satisfy the requirements of 20 C.F.R. § 404.1594(f).

## B. Inconsistent Findings

■ Lewis claims that the following findings of the ALJ on the issue of residual functional capacity are so inconsistent or ambiguous as to be unreviewable: [8]

> 5. For the period beginning October 06, 1994, the claimant has been restrict-

8. The Court notes that Lewis himself is inconsistent in that he says he is discussing the period from February 21, 1993 until October 6, 1994, but the findings quoted state "For the period beginning October 06, 1994." The Court assumes it is the period after October 6, 1994 that Lewis is concerned about.

ed to lifting and carrying more than 10–15 pounds.

. . . . .

7. For the period beginning October 06, 1994, the claimant's capacity for a full range of light work has been diminished by his inability to walk more than three to four blocks. He can stand 15–20 minutes, occasionally, sit for 1 hour occasionally, and is to avoid a regimented pace.

R. at 185.

The Court agrees that it is unclear what the ALJ has in mind when he states that the claimant can sit for one hour *occasionally*. However, the Court is not limited to reading only the ALJ's findings, but is at liberty to review the transcript from· the hearing, other portions of the ALJ's decision, and any other documents it finds relevant in the 375 page record from this case. The second question put to the vocational expert sheds light on this statement. R. at 39. It says that the hypothetical person can sit for approximately one hour without needing to stand and move around, but that occasionally, the person would need to change positions more frequently. By reading the two statements together, it becomes clear that the ALJ found that Lewis could walk no more than three to four blocks, that he could only stand occasionally, for as long as 15–20 minutes at a time, and that he could sit for up to one hour without having to stand up and move around, but that occasionally he would need to stand or change positions more frequently than once an hour. Although the ALJ's findings on the issue of Lewis's ability to sit are unclear, the Court finds that the record as a whole resolves any doubts as to the meaning of this finding, making it possible for this Court to review his decision.

**C. The Hypothetical**

■ Lewis raises a number of objections to the hypothetical question and the testimony of the vocational expert. First, he objects to the ALJ's statement that "the vocational expert testified that there is no evidence that he has acquired any transferable work skills" (R. at 183), when the ALJ never asked the vocational expert about transferable job skills. Although the ALJ's statement is inaccurate, it is harmless error, as it appears the ALJ either decided himself or assumed without deciding that Lewis had no transferable job skills.

■ In addition, Lewis objects to the jobs identified by the vocational expert, claiming that they are inconsistent with the jobs identified as unskilled in the Department of Labor's *Dictionary of Occupational Titles* (the DOT) (4th ed.1991). Lewis claims that according to the DOT, the sedentary job of cashier is skilled, requiring "Over 6 months up to and including 1 year" for a typical worker to gain the ability to perform the job. In addition, the stationary guard jobs are semi-skilled.

The Seventh Circuit just recently rejected an argument similar to the Plaintiff's, stating that it would give the DOT the force of law, and create an independent source of listed impairments. *See, Donahue v. Barnhart*, 279 F.3d 441 (7th Cir. 2002). The Court in *Donahue* determined that the Commissioner is entitled to examine independently those questions covered by the *Dictionary*, and may rely on the testimony of the vocational expert even if it differs from the *Dictionary*. *Id.* In this case, the vocational expert, Dr. Fisher, was highly qualified. R. at 131–34. He prepared a summary of Lewis's past relevant work. R. at 154. He stated that he is familiar with the applicable regulations and their requirements, including the requirement that he consider the claimant's

age and education as vocational factors, and with the "approximately 2500 jobs requiring sedentary, light, and medium exertion which do not require skills or previous work experience of which the Secretary of Health and Human Services has taken administrative notice . . ." R. at 155.

The Court concludes that the ALJ was entitled to rely on the vocational expert's opinion that a person with the abilities and limitations posed to him in the hypothetical and with Lewis's education and background was capable of performing the jobs of cashier unarmed guard, in spite of their classification in the DOT as skilled or semi-skilled. In addition, even if Lewis was successful in eliminating the two categories of jobs because they required job skills which he did not possess, there were still over 1,000 jobs left on the vocational expert's list that Lewis could perform with his limitations, including inspectors, self-service gas station attendants, surveillance monitors, and parking attendants. This number, although not great is sufficient for the Commissioner to meet her burden.

Lewis raised another objection to the hypothetical, claiming that the ALJ erred evaluating Lewis's level of education, based on the regulations in 20 C.F.R. 404.1564(b). Pl.'s Br. at 14. He claimed this failure was in addition to the ALJ's failure to even ask the vocational expert to consider Lewis's age and level of education. Id. The ALJ's finding No. 9 states that Lewis had a high school education. R. at 185. However, objective testing indicated that Lewis's spelling skills were only at a fifth-grade level, and his computation skills at the eighth-grade level.

The Seventh Circuit has not directly addressed this issue, but the Eight Circuit has considered the effect of these regulations in determining the claimant's educational ability. See, Walston v. Sulli-

van, 956 F.2d 768 (8th Cir.1992). The Court observed that the regulations recognize that the grade completed may not accurately represent a claimant's educational abilities. Walston at 773, citing 20 C.F.R. 404.1564(b). "A claimant's formal education is conclusive proof of his educational abilities only if no other evidence is presented to contradict it." Id. In Walston, the Eight Circuit determined that the Secretary erred in using the claimant's years of formal education and the fact that he achieved a full-scale IQ score of 92 to determine the claimant's educational level, when educational testing established that he functioned at a much lower level. Id. at 773. The Eight Circuit remanded the case with directions to award benefits to the claimant. Id.

In this case, the psychologist who administered the educational tests to Lewis stated that he was functioning in the Average range of overall level of ability, but that he had a significant impairment in spelling. According to the regulations, the spelling impairment should have been considered in determining if Lewis could learn and perform the jobs which the vocational expert testified were available in the regional economy. There is no evidence in the record that this impairment was taken into consideration by the vocational expert, so the Court has no way of knowing if it would have affected his ability to perform any of the suggested jobs.

### D. Substantial Evidence

Lewis's next two arguments relate to the ALJ's evaluation of his mental and physical condition, in which he alleges that the decision is not supported by substantial evidence in the record. As noted above, this Court will not overturn the Commissioner's denial of benefits if supported by substantial evidence in the record. In this case, additional medical evi-

dence was submitted to the Appeals Council. Therefore, the Court will consider first whether the ALJ's decision was supported by substantial evidence based on the medical evidence submitted by the time of the hearing, and if it was, consider next whether the Appeals Council's decision to affirm the ALJ was correct in determining that the additional medical evidence was not sufficient to warrant a remand.

### 1. The ALJ's Decision

 Lewis argues that, because of the medical complexity of his back condition, the ALJ should have informed his decision with testimony from a medical expert. Pl.'s Br. at 17. The Commissioner asserts that the medical evidence reveals that Plaintiff's back and neck condition markedly improved following surgery, and that he was capable of returning to work in October, 1994. The Court has searched through the record, and does not find support for the Commissioner's determination that Lewis was capable of returning to work in October of 1994. The ALJ's own decision is inconsistent on this point.

October 6, 1994, was approximately two months following Lewis's second back surgery. The record shows that on that date, Lewis's back looked excellent, all three grafts were in site and healing well, and that his treating physician, Dr. Collis, thought that Lewis should be able to return to work in *three to four months*. At the time, he was still instructed to wear a Miami collar, and not to increase his activities to his tolerance level. It was not until January, 1995, that Lewis was actually released to return to work.

The ALJ was familiar with this recommendation, and in his decision stated, "He was allowed to return to light work *five months* after surgery, and to his usual work four months later." (Emphasis add-

ed). Five months after surgery would have corresponded to Dr. Collis's return date of January, 1995. The Court does not find any evidence in the record that Lewis was actually able to return to work in October, or that his physician released him to return to work at any time before January of 1995. Therefore, the Court finds that the ALJ's determination that Lewis was not disabled after October 6, 1994 is not supported by substantial evidence in the record, as he was still recovering from his surgery.

### 2. Credibility

 The ALJ determined that Lewis's statements concerning his impairment and its impact on his ability to work are not entirely supported by the medical evidence. The claimant's statement as to pain or other symptoms is not alone conclusive evidence of disability; it must be supported by "medical signs and findings ... which could reasonably be expected to produce the pain or other symptoms alleged." *Walker v. Bowen*, 834 F.2d 635, 641 (7th Cir.1987) (quoting 42 U.S.C. § 423(d)(5)(A) (1986)); *see also* 20 C.F.R. 404.1529(a). The ALJ's determination on the credibility of the plaintiff's testimony regarding pain will be upheld on appeal as long as there is some support in the record for the ALJ's position and it is not patently wrong, since the ALJ is in the best position to observe witnesses and assess their credibility. *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir.1994).

 "However, when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision." *Id.* In this case, the ALJ's credibility determination was not based on his observations in the courtroom, but on a perceived lack of support for Lewis's state-

ments in the medical record. R. at 179. To support this, the ALJ cites Dr. Collis's letters from October 1994, January 1995, and May 1995, in which Dr. Collis observes that Lewis's x-rays looked excellent, his back was healing, and he could return to work. *Id.* at 180–81. The ALJ mentioned Dr. Madison's diagnosis of arachnoiditis with intractable pain from October 9, 1996, but does not discuss the diagnosis any further.

The Commissioner has included arachnoiditis in the Appendix under disorders of the spine, stating, "Spinal arachnoidits is a condition characterized by adhesive thickening of the arachnoid which may cause intermittent ill-defined burning pain and sensory dyesthesia ..." *See*, 20 C.F.R. 404, Subpt. P., App. 1, K(a). The regulation provides the following information on documentation:

> although the cause of arachnoiditis is not always clear, it may be associated with chronic compression or irritation of nerve roots (including the cauda equina) or the spinal cord. For example, there may be evidence of spinal stenosis, or a history of spinal trauma or meningitis. Diagnosis must be confirmed at the time of surgery by gross description, microscopic examination of biopsied tissue, or by findings on approprate medically acceptable imaging. Arachnoiditis is sometimes used as a diagnosis when such a diagnosis is unsupported by clinical or laboratory findings. Therefore, care must be taken to ensure that the diagnosis is documented as described in 104B. Individuals with arachnoiditis, particularly when it involves the lumbo-sacral spine, are generally unable to sustain any given position or posture for more than a short period of time due to pain.

20 C.F.R. 404, Subpt. P., App. 1, K(b).

The case law is limited on arachnoiditis, but enough exists to indicate that it can be a serious problem. According to Stedman's Medical Dictionary, arachnoiditis is an inflammation of the arachnoid, a delicate membrane surrounding the spinal cord. *Stedman's Medical Dictionary*, at 118–19. It is a nerve injury common among patients who have had multiple back surgeries. *Talley v. Danek Medical, Inc.*, 179 F.3d 154, 156 (4th Cir.1999). Arachnoiditis may cause "headache, epileptic seizures, blindness, or slowly progressive spastic paralysis (difficulties with movements due to increased muscle tension) affecting both legs or all four limbs." *Welsh v. Burlington Northern, Inc.*, 54 F.3d 1331 (8th Cir.1995), citing, American Medical Association, *Encyclopedia of Medicine* at 128 (C. Clayman ed.1989). There is "no effective treatment" for arachnoiditis. *Id.*[9]

Dr. Madison diagnosed Lewis on more than one occasion as having arachnoiditis with intractable pain. He was one Lewis's treating physicians from December of 1994 until at least October of 1996. The opinion of a treating physician is entitled to great weight if supported by objective findings. 20 C.F.R. 404.1527. This diagnosis supports Lewis's claim that, although his back was healing properly after surgery, he still had severe pain that prevented him from being able to work. The ALJ does not

---

**9.** The National Institute of Neurological Disorders and Stroke maintains a website with information on arachnoiditis, which states, "There is no cure for arachnoiditis. For the majority of patients, arachnoiditis is a disabling disease causing intractable pain and neurological deficits. As the disease progresses, some symptoms may increase and become permanent. Few people with this disorder are able to continue working. In some cases, progressive paraplegia may occur." <http:// www. ninds.nih.gov/health—and—medical/ disorders/archnoi—doc.htm>

appear to have given Dr. Madison's diagnosis much weight, however, the record is not fully developed on this point.

### 3. Mental Condition

■ Lewis also argues that the ALJ erroneously evaluated his mental condition, including his significant memory impairment. During the hearing, Lewis questioned whether the vocational expert adequately considered his psychological report and the effects of his pain and the medication he takes on his ability to work. In particular, Lewis noted the problems with visual tracking and attentional deficits from the report. The ALJ responded by asking the vocational expert a question about one of Lewis's test scores, which was within the range of normal.[10] He does not mention any of the problems Dr. Hanig noted in his report, that Lewis had mild to moderate attentional deficits with significant impairments in memory and spelling.

The ALJ determined that Dr. Hanig stated initially that the claimant's memory skills seemed to be intact, which was contradictory with his statement that the claimant had a significant impairment in memory, noting that Dr. Hanig did not perform any objective memory testing such as the Weschler Memory Scale. R. at 182. The ALJ concluded that Dr. Hanig's opinion was internally inconsistent and not based on any objective evidence. *Id.*

Dr. Hanig's report actually states that the claimant's memory skills on observation seemed intact. R. at 167. This was in the section entitled, "Observations." *Id.* Dr. Hanig's testing revealed, however, that Lewis had significant memory deficits as measured on the California Verbal Learning Test. *Id.* at 169. The relevant parts of Dr. Hanig's opinion, based on this test,

were that Lewis had "considerable difficulty with recall, and cannot learn adequately across trials. He seems susceptible to retroactive interference, has high forgetting, and difficulty with retrieval." R. at 169–70. The Court finds that Dr. Hanig's report was not internally inconsistent, but rather reflected the difference between the results of observation and testing. The Court also concludes that the ALJ's statement, "There is no evidence that the claimant has any significant memory or depression difficulties," is not supported by the record.

■ In addition, because Lewis brought it up, the ALJ should have determined what, if any, effect the various medications Lewis was taking might have on his ability to do the jobs mentioned in the vocational expert's testimony. The C.F.R. regulations on evaluating symptoms, including pain, require the Commissioner to consider the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(iv); *see also Herron v. Shalala,* 19 F.3d 329, 335 (7th Cir.1994). The ALJ does not have to make specific findings concerning the side effects of prescription drugs on the claimant's ability to work, but the ALJ does need to include enough information for the reviewing court to determine whether the decision is supported by substantial evidence. *Id.* In this case, other than noting that the regulations require careful consideration of a list of factors, including the type, dosage, effectiveness, and adverse side-effects of any pain medication (R. at 179), the ALJ does not seem to have considered what effect

---

**10.** The ALJ presented the results of the Kaufman test to the vocational expert. It tests verbal and nonverbal intelligence.

Lewis's various medications might have on his ability to work.

■ In his report, Dr. Hanig also noted that Lewis suffered from depression, secondary to injury. Lewis argues that the ALJ discounted Dr. Hanig's diagnosis that he had depression secondary to injury, and that he practiced medicine, when he concluded that Lewis had "situational" depression. Pl.'s Br. at 18. However, the record indicates that Dr. Hanig felt it was imperative that Lewis participate in counseling to help him cope with his physical disabilities as well as the emotional problems associated with it, and Lewis does not claim that he got counseling for depression, or that he sought any medical treatment for depression. The ALJ found that because Lewis is not treated for depression and does not take any anti-depressive medications, he had no severe impairment due to depression. This conclusion is supported by the record.

### E. The Waiver and Development of the Record

■ Lewis also objects to the ALJ's decision because the ALJ did not elicit a valid waiver of his right to proceed with a representative. Pl.'s Br. at 19. A claimant has a statutory right to counsel at disability hearings. 42 U.S.C. § 406; 20 C.F.R. § 404.1700. The claimant must be properly informed of this right, but may waive it "if given sufficient information to enable him to intelligently decide whether to retain counsel or proceed *per se*." *Thompson v. Sullivan*, 933 F.2d 581 (7th Cir.1991). Information that will ensure a valid waiver of counsel includes an explanation of the manner in which an attorney can aid in the proceedings, the possibility of free counsel or a contingency arrangement, and the limitation on attorneys' fees to twenty-five percent of past-due benefits plus required court approval of the fees.

*Id.; See also Smith v. Schweiker,* 677 F.2d 826 (11th Cir.1982).

■ Courts have held waiver of counsel invalid when an ALJ failed to fully discuss the possibility of contingency arrangements or free counsel. *See Thompson,* 933 F.2d 581; *Smith,* 677 F.2d 826; *Clark v. Schweiker,* 652 F.2d 399 (5th Cir. 1981). Courts have also found waiver invalid where the ALJ failed to fully inform a claimant of the importance of obtaining counsel, thereby prejudicing the plaintiff. *See Cowart,* 662 F.2d 731; *Clark,* 638 F.2d 1347; *Berry v. Califano,* 471 F.Supp. 446 (E.D.Wis.1979); *Herlache v. Califano,* 478 F.Supp. 848 (E.D.Wis.1979). "Where the disability benefits claimant is unassisted by counsel, the ALJ has a duty 'scrupulously and conscientiously [to] probe into, inquire of and explore for all of the relevant facts ...'" *Binion v. Shalala,* 13 F.3d 243, 245 (7th Cir.1994) (citations omitted). When a claimant's waiver of the right to representation is invalid, then the burden shifts to the Commissioner to prove that the ALJ discharged his heightened duty to develop the record. *Id.* Failure to fulfill this special duty is good cause to remand for gathering of additional evidence. *Id.*

In this case, the ALJ's discussion with Lewis about counsel was brief. He asked three questions, "Have you thought about having an attorney represent you?"; "Have you ever had an attorney represent you before in anything?"; and "So you'd like to go ahead today without an attorney?" R. at 21. The fact that Lewis had been represented by counsel in another setting does not mean that he understood the benefits of counsel in the context of a social security disability administrative hearing. Therefore, his waiver of the right to representation was invalid, and the burden shifts to the Commissioner to

prove that the ALJ discharged his heightened duty to develop the record.

 As the Court has already found more than one instance in which the ALJ did not adequately develop the record, some of which were significant, the Court concludes that the Commissioner has not met her burden on this issue. For the record, the Court notes that the following statements in ALJ's decision are also incorrect: that Lewis "has been consistently urged to enter a work hardening program but has not done so", R. at 182; and that the claimant has "no neurological deficits to account for the radiation of pain alleged", *Id.*

The evidence in the record indicates that Lewis did in fact do physical therapy and work hardening exercises, although that evidence was not included in the record until it the decision was appealed. As Lewis was unrepresented, under his duty to fully develop the record, the ALJ should have asked Lewis if he had done the exercises instead of assuming that he had not. In addition, Lewis underwent neurological testing which indicated that his lower and upper somatosensory studies were abnormal, that upper and lower dermatomal responses were abnormal, but that only one test, the nerve conduction study, was within the range of normal. This evidence does not appear to have been considered by the ALJ.

### VII. SUMMARY

 In this rather lengthy analysis, the Court has noted a number of errors in the ALJ's decision. Some were minor in nature, of the kind usually attributed to clerical errors. However, some of the errors were significant and warrant remand of this case to the Commissioner for further proceedings. In particular, the Commissioner's finding that Lewis was no longer disabled, and therefore capable of returning to work after October 6, 1994, is not supported by substantial evidence. The record does not support a finding that Lewis was no longer disabled until at least January of 1995. Therefore, the Court hereby GRANTS the Plaintiff's Motion and REMANDS the case for further agency proceedings consistent with this opinion. On remand, the Commissioner should consider the other issues raised by the Claimant and whether they would affect the finding that Lewis was not disabled after January of 1995.

Finally, the Court notes that Citizens who have claims pending with the Social Security Administration deserve far better than this Claimant had with the Appeals Counsel. It is simply appalling that this Claimant's file was apparently treated so cavalierly by these government officials. Because the Commissioner lost the record in this case for a period of years, this Claimant has already waited an unreasonable amount of time for a ruling, and further proceedings should be conducted with all deliberate speed.

**IT IS SO ORDERED.**