John CORRIGAN, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner, Social Security Administration, Defendant.

No. CIV.A.98–10601–WGY.

United States District Court,
D. Massachusetts.

Dec. 21, 2004.

Sandra L. Smales, Jamaica Plain, MA, for John Corrigan, Plaintiff.

Jeremy M. Sternberg, United States Attorney's Office, Boston, MA, for Jo Anne B. Barnhart, Defendant.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

## I. INTRODUCTION

This action is brought under section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), and seeks judicial review of a final decision of the Commissioner of the Social Security Administration (the "Commissioner"). The plaintiff, John Corrigan ("Corrigan"), challenges the determination of the Administrative Law Judge ("hearing officer") and subsequently of the Appeals Council that Corrigan was disabled for only a closed period ending August 19, 1993. Arguing that the decision of the Commissioner terminating his benefits on August 19, 1993 was not supported by substantial evidence or a proper application of the law, Corrigan requests that this Court reverse the decision. Pl.'s Mot. To Reverse the Decision of the Comm'r [Doc. No. 12] (filed May 7, 2004); Pl.'s Mem. in Supp. [Doc. No. 14] ("Pl.'s Mem."). Specifically, Corrigan contends that the hearing officer erred in failing to use the required medical improvement analysis, and that even if evidence demonstrated improvement of his medical condition, there is no substantial evidence that support the

conclusion that he had regained the ability to perform substantial gainful activity. Pl.'s Mem. at 2. The Commissioner filed a cross motion to affirm the decision of the Commissioner. Def.'s Mot. for Order Aff'g the Decision of the Comm'r [Doc. No. 16] (filed June 24, 2004); Def.'s Mem. in Supp. [Doc. No. 17] ("Def.'s Mem.").

## II. BACKGROUND

### A. Procedural History

Corrigan sustained a workplace lifting injury to his back on September 20, 1988. R. at 132, 239. Following this injury, Corrigan had corrective surgery twice, in June of 1989 and in September of 1991. *Id.* at 137. Corrigan then filed for Social Security Disability Insurance Benefits on December 13, 1991. *Id.* at 132. This application was denied by the Social Security Administration ("Administration") in January, 1992. *Id.* at 136–37. Corrigan did not appeal this denial, but subsequently reapplied for benefits on July 26, 1993. *Id.* at 95, 97. This second application was denied on October 13, 1993, and this denial of benefits was upheld by the Administration on May 18, 1995 following a request for reconsideration. *Id.* at 112, 128. In June 1995, Corrigan filed a request for hearing by an Administrative Law Judge. *Id.* at 130. A hearing was held by Administrative Law Judge Halfyard on June 20, 1996, at which time the hearing officer did not reopen the first application but did find that Corrigan was disabled for a closed period of September 21, 1988 through August 18, 1993. *Id.* at 322, 323, 344–46. The Appeals Council granted Corrigan's request for review and after reopening the first application the Council upheld the hearing officer's determination that Corrigan was disabled for a closed period of September 21, 1988 ending August 19, 1993. *Id.* at 357–59. Corrigan then appealed to this Court, at which time the case was remanded due to the inability of the Appeals Council to locate the tape recording of the first hearing. *Id.* at 360.

On remand, the Appeals Council vacated its earlier decision that Corrigan's disability ended on August 19, 1993 and remanded for further hearing to determine the proper ending date. *Id.* at 363. After a hearing and review of the record, the hearing officer again found that Corrigan was disabled for the closed period ending August 19, 1993. *Id.* at 33–34. On April 22, 2003, the Appeals Council upheld the decision of the hearing officer, stating that there was no basis for changing the decision and no basis for the Council to assume jurisdiction. *Id.* at 7–8. Accordingly, the decision of the hearing officer is the final decision of the Commissioner following remand in accordance with 20 C.F.R. 404.984(b)(2). *Id.* at 8. On May 7, 2004, Corrigan filed a Motion to Reverse the Decision of the Commissioner and seeks further review regarding the period of disability pursuant to 42 U.S.C. § 405(g). Pl.'s Mot. To Reverse the Decision of the Comm'r [Doc. No. 12] (filed May 7, 2004); Pl.'s Mem.

### B. Factual Background

At the time of the hearing on February 22, 2001, Corrigan was 46 years old with a high school education. R. at 32, 172. Corrigan had also taken courses in the maintenance of heating and cooling systems. *Id.* Most recently, from January of 1989 to March of 1989, Corrigan worked in a package delivery service approximately three days per week. *Id.* Prior to that, Corrigan had worked as a maintenance manager at Jordan Marsh from July of 1987 through the time of his injury in September of 1988. *Id.* As of the date of the hearing, Corrigan had received Workers' Compensation and benefits for a closed period of disability. *Id.* at 33. At the end of 1998, Corrigan's insured status expired while he was 43 years old. *Id.*

## 1. Medical Evidence

It is undisputed that on September 20, 1988, Corrigan sustained an injury to his back while lifting a coil of electrical wire. *Id.* at 239; Def's Mem. at 2. Corrigan was seen at Cambridge City Hospital Emergency Room the next day, where he was diagnosed with low back strain and was told to take one week off from work. *Id.* After a week, Corrigan attempted to return to work but could barely walk and was forced to return to Cambridge City Hospital, where he for some reason did not receive treatment. *Id.* At the recommendation of his chiropractor, he received a CT scan which revealed that he had problems at two disc levels. *Id.* From January to March 1989, Corrigan worked as a package deliverer, but was forced to leave due to frequent absences due to back pain. *Id.* at 99, 162, 168.

In May 1989, Corrigan consulted with Dr. Mortara, a neurosurgeon. *Id.* at 239–240. Dr. Mortara reported that Corrigan was in obvious pain and had a tight back with "much muscle spasm." *Id.* at 240. Dr. Mortara noted that although a previously performed CT scan revealed discs bulging at two disc levels, nothing revealed a sizable disc herniation. Der. Mortara therefore recommended rehabilitation rather than surgery. *Id.*

Two weeks later, on May 15, 1989, Corrigan was admitted to Boston University Hospital for continued back pain with radiation down both legs and intermittent numbness and tingling. *Id.* at 219. A myelogram and CT scan revealed L4–5 diffuse disc bulge and L5–S1 posterolateral disc herniation with posteromedial displacement of the nerve root. *Id.* at 218. On June 27, 1989, Corrigan was admitted for surgery and underwent a right L5–S1 hemilaminectomy, foraminotomy,[1] and excision of a herniated disc. *Id.* at 203, 237. Following the surgery, Corrigan reported improvement and reduced pain in the recovery room, and was discharged June 30, 1989. *Id.*

About a month later, Corrigan went to Dr. Mortara for a follow up visit, during which Corrigan stated that he had been in a car accident on July 20, 1989 and felt immediate tingling in his right leg following the accident. *Id.* at 235. He was treated at Massachusetts General Hospital, and subsequently developed back, neck and leg soreness which lasted a few days before subsiding. *Id.* Dr. Mortara reported overall improvement in Corrigan's condition stating that he was "getting around better" and did not have any "outstanding pain." *Id.* He noted that Corrigan still reported aching pain in his right leg and tingling of his right foot. *Id.* Dr. Mortara concluded that "[h]e has overall done well but still has improvement to make in terms of back mobility and functional ability," and thus referred him to the Outpatient Rehabilitation Department at Youville Hospital. *Id.* at 235–36.

Corrigan began receiving therapy at Youville Hospital three times a week, and returned to Dr. Mortara for a follow up visit in mid-September of that year. *Id.* at 232. Dr. Mortara reported that Corrigan was "doing quite well" and noted that he walked for an hour daily and overall "feels pretty good." *Id.* Dr. Mortara advised him not to return to work that involved heavy lifting, but indicated that he anticipated Corrigan would be fit to do less

---

1. A report by Dr. Mortara in the Record describes one of Corrigan's procedures as a foraminectomy, while a different report by Dr. Mortara describes the procedure as a foraminotomy. *Id.* at 203, 237. For present purposes, this Court may assume that these procedures are similar or are the same and concludes that the reports are consistent on this point.

physically demanding work within two weeks. *Id.* at 232–33.

Corrigan did not return to work within two weeks, however, and went to see Dr. Mortara again November 1, 1989 due to an onset of back spasm apparently resulting from a long car ride to New Hampshire the previous weekend. *Id.* at 230. Dr. Mortara noted that Corrigan could not sit still for more than 15 minutes without developing pain, but reported that he believed the pain was only "temporarily disabling" and suspected improvement within a few weeks. *Id.*

Pain continued and on January 9, 1990 Corrigan again went to seek consultation at University Hospital, where an x-ray taken revealed degenerative changes at L3–4 and L4–5 with a mild to moderate degree of diffuse disc bulge. *Id.* at 201. Dr. Beers noted that there was no convincing evidence of disc herniation at this time. *Id.*

By February and March 1990, Corrigan was able to take walks for 45 minutes to 60 minutes. *Id.* at 309. Throughout the spring of 1990, his clinical course fluctuated and his mood deteriorated. *Id.* Due to his deteriorating emotional and physical condition, Corrigan was admitted to Spaulding Rehabilitation Hospital for an inpatient pain program. *Id.* At Spaulding, Corrigan showed "dramatic relief" but his condition again deteriorated upon returning home. *Id.* at 309–10. He sought consultation at the ·behavioral medicine program of Cambridge Hospital where he was prescribed lithium to calm his anger and stabilize his mood. *Id.* at 310.

On December 21, 1990, Corrigan was seen in the emergency room where he complained of continual low back pain. *Id.* at 198. At this time he was prescribed Motrin and Flexeril, and was put on strict bed rest. *Id.* Corrigan was told to follow up with Dr. Mortara in one or two weeks. *Id.* Ten days later Corrigan was referred

to Dr. Patterson of Occupational Health Services for evaluation. *Id.* at 307.

During this visit, Dr. Patterson reported that Corrigan was unable to sit for more than five to ten minutes, had mild difficult transferring, and had midline tenderness over the lumbar spine. *Id.* at 310. He also noted that Corrigan experienced diminished pin prick sensation in the right foot and that his right leg appeared larger than the left in both the calf and thigh regions. *Id.* Dr. Patterson opined that it was worth pursuing the disc herniation noted in the March 21, 1989 CAT scan, and recommended lithium and possible use of Prozac to manage his emotional condition. *Id.* at 311. Dr. Patterson further recommended that Corrigan seek retraining for alternate employment "as promptly as possible". *Id.* at 312. He conclusively opined that "Mr. Corrigan would be suitable at the present time to perform work of a restricted nature." *Id.* Specifically, Dr. Patterson recommended that Corrigan "be assigned to duties which involve no lifting over 10 to 15 pounds.... there should be no repeated bending, stooping, twisting, or reaching." *Id.* Additionally, Dr. Patterson noted that mixing activities to avoid static positions could avoid aggravating Corrigan's condition. *Id.* He suggested that Corrigan begin working a total of four hours per day. *Id.*

An MRI of January 10, 1991 showed that Corrigan had a diffuse bulging disc at L4–5 but no recurrent herniation. *Id.* at 197. A week later, on January 17, 1991, Corrigan returned to Dr. Mortara's office complaining of low back pain. *Id.* at 224. Dr. Mortara noted that the pain complained of was more intense than preoperatively and that at times Corrigan feels like he cannot effectively move. *Id.* Dr. Mortara concluded that his pain seems to be more mechanical than neurological, and he thus referred Corrigan to Spaulding

again for rehabilitation and prescribed Flexeril and Naprosyn for pain relief. *Id.* at 225.

In May of 1991, Dr. Grady, an orthopedic surgeon, examined Corrigan and suggested that he meet with the surgeon who carried out his disc surgery. *Id.* at 243. He noted that Corrigan was not working and that he continued to be disabled. *Id.* He also noted that Corrigan was no longer seeking psychiatric help and was not taking any medications such as Lithium. *Id.*

The following month, in June, 1991, Corrigan was admitted to the emergency room due to shooting pains down his left leg as a result of a quick application of the brakes while driving. *Id.* at 277. Three x-rays taken that day revealed spina bifida occulta of S1, which is defined as a cleft spine or incomplete closure of the vertebrae. *Id.* at 279; see also Taber's Cyclopedic Medical Dictionary 1844 (17th ed.1993). The x-rays were otherwise normal in that they showed no signs of compression, fracture, or narrowing. R. at 279.

In July, 1991, Corrigan was admitted to Somerville Hospital for his back pain. *Id.* at 264. Dr. Massand attended to Corrigan, and stated that the he had severe right sided sciatica. *Id.* at 265. A myelogram taken before discharge revealed "prominent extradural defect at L4 L5 toward the left with a herniated disc and extradural defect at L5 S1 with right sided herniated disc at L5S1." *Id.* Dr. Massand recommended that Corrigan seek a second opinion, continue conservative management, and advised him that he would probably need a decompression laminectomy and foraminotomy at L4–L5 and L5–S1. *Id.* at 266.

In August, 1991, Corrigan consulted with Dr. Hoerner, who concluded that Corrigan was a candidate for surgical intervention. *Id.* at 189. A few weeks later, in September, 1991, Corrigan consulted with Dr. Dorsey, a neurological surgeon. *Id.* at 190. In his description of Corrigan's injury, Dorsey noted that an MRI taken the previous month revealed "disc degeneration at L4–5 and L5–S1, a slight posterior and central disc bulge at L5–S1, disc herniation posteriorly, centrally on the right side at L4–5, together with a bulge in the posterior longitudinal ligament." *Id.* Dr. Dorsey noted that surgery would be a reasonable approach to Corrigan's problem, opining at that time that "he is totally disabled and certainly without further surgery his disability is just going to continue on into the future." *Id.* at 191.

On September 30, 1991, Corrigan was admitted to Somerville Hospital for surgery. *Id.* at 247–48. At this time, Corrigan underwent decompression laminectomy, L4–L5 and L5–S1, discectomy bilateral at L4–L5, foraminotomy L5–S1 nerve root bilateral, and neurolysis of right L5 nerve root. All procedures were performed by Dr. Massand. *Id.* at 248, 303. Corrigan returned to Dr. Massand on December 16, 1991 at which time Dr. Massand opined that Corrigan's post-operative progress was "uneventful." *Id.* at 293. In a memo composed on January 7, 1992, Dr. Massand wrote that Corrigan should seek part-time light work. *Id.*

In May 1992, Corrigan was examined by Dr. Patterson. *Id.* at 303. Dr. Patterson reported that Corrigan physically feels "like a wreck" and feels essentially the same as before his second surgery. *Id.* According to the report, Corrigan had received epidural injections in February and in March he was hospitalized for traction. *Id.* at 305. Dr. Patterson also noted that Corrigan's physician recommended that he return for traction. *Id.* at 304. Corrigan complained of pain radiating to the legs, and Dr. Patterson observed that he could not sit for more than five to ten minutes without moving. *Id.* at 303–04. Reflexes

and pin prick were diminished and straight leg raising was positive at 70 degrees bilaterally. *Id.* at 304. In his assessment, Dr. Patterson concluded that Corrigan "remains disabled at the present time due to a combination of factors," and that his disability "prevents him from performing all but the lightest of activities." *Id.* at 305. He further opined that Corrigan was not a good candidate for vocational rehabilitation, noting that response to a pain management program may change that assessment. *Id.* at 305–06. In accordance with AMA Guidelines, Dr. Patterson found Corrigan to have a twelve percent impairment of the whole person. *Id.* at 306.

Corrigan was last seen by Dr. Massand on July 31, 1992. *Id.* at 291. On his write-up of the visit, Dr. Massand noted that Corrigan had "marked improvement in his condition and reduction of radicular symptoms and signs." *Id.* He further noted that due to Corrigan's traveling to New Jersey, he had developed recurrent, acute lumbar muscle strain for which he was hospitalized on several occasions. *Id.*

On November 17, 1992, Dr. Patterson performed a follow-up consultation on Corrigan. *Id.* at 300. Dr. Patterson reported that Corrigan complained of ongoing low back pain and sacral pain made worse by sitting and by exercise. *Id.* He noted that straight leg raising was limited at 70 degrees, and that there was diminished pin prick sensation over the right lower leg. *Id.* Corrigan reported ongoing sleep disturbance and feelings of depression to Dr. Patterson, and stated that he was obtaining medication on the street. *Id.* Dr. Patterson noted that his findings were "relatively consistent with the findings in May," and further opined that Corrigan was "fully disabled due to degenerative disc disease." *Id.* at 301. While noting that Corrigan had not been receiving adequate treatment, Dr. Patterson prescribed Oru-

sid, TID, and amitriptyline, and scheduled a follow up visit for October 30, 1992. *Id.*

In April 1993, Dr. Saperstein examined Corrigan upon request of the Department of Industrial Accidents in Massachusetts. *Id.* at 288. Dr. Saperstein noted that Corrigan walked with a "very uncomfortable gait, waddling in nature, indicative of chronic, subjective discomfort in the low back." *Id.* at 289. Straight leg raising was positive at 70 degrees, knee and ankle jerks were present, and Corrigan demonstrated no significant sciatica. *Id.* He put forth a diagnosis of "status post excision of ruptured intervertebral discs with traumatic arthritis of his low back." *Id.* He concluded that Corrigan was "totally disabled for any and all occupations at [that] particular time." *Id.*

In August 1993, Corrigan returned to Dr. Patterson. *Id.* at 298. Dr. Patterson reported that Corrigan was able to walk up to one-half mile once or twice a day with a moderate degree of aching afterwards. *Id.* He noted moderate to severe back spasm with intermittent radicular pain, and moderate depression. *Id.* Straight leg raising was limited to 70 to 80 degrees bilaterally with back pain. *Id.* He noted that Corrigan's condition has "fluctuated considerably" over the last several years, and opined that he had "reached a medical end point." *Id.* at 299. He advised that Corrigan continue with exercise and continue using antidepressant and anti-inflammatory medications. *Id.* It is appropriate to reiterate here that the hearing officer found that Corrigan's disability ceased on August 19, 1993. *Id.* at 34.

In October 1993, Dr. Patterson wrote a letter to a Jury Commissioner asking that Corrigan be excused from jury duty due to his inability to sit still for six hours a day with short breaks. *Id.* at 469. Dr. Patterson noted that his pain and medication

interfered with his ability to sit for long periods of time and further affected his ability to pay attention. *Id.* The letter specified that Corrigan suffered from a "chronic, serious back condition" from which he was "fully disabled." *Id.*

In November 1993, Dr. Patterson referred Corrigan to spine surgeon Dr. Linson. *Id.* at 295. After discussion, Dr. Linson advised that Corrigan would be a candidate for lumbar fusion if his condition did not improve. *Id.* An MRI report dated January 31, 1993 cited a laminectomy defect at L–5–S–1, a large right paramedian disc herniation at L–4–5, a minimal annulus bulge, and degenerative changes at L–4–5. *Id.* at 374. Some time in mid–1994, Corrigan began taking Percocet for his pain and Voltaren (an anti-inflammatory). *Id.* at 448–50.

In a visit to Dr. Patterson in late November 1994, Corrigan stated that he was able to walk in the mall once or twice a day while wearing his brace. *Id.* at 295. He stated that he "wouldn't be able to walk without the brace," and reported stiffening up quickly. *Id.* He also noted that he did light stretching exercises "all the time." *Id.* Straight leg raising was positive at 60 degrees, and reflexes were symmetrical. *Id.* Pin prick sensation was reported as generally symmetrical with occasional suggestions of diminished sensation over the left web space or over the right lateral foot. *Id.* Dr. Patterson felt that Corrigan would probably not benefit from lumbar fusion and therefore did not advise it, and he further concluded that Corrigan was not "suitable to return to restricted duty at this time." *Id.* at 296. Dr. Patterson rated his degree of impairment as 25% impairment of the whole-person. *Id.* at 297.

During a February 1995 examination, Corrigan told Dr. Patterson that he was having more bad days than good days. *Id.* at 442. He also told Dr. Patterson that he was walking up to a mile at least once a day, weather-permitting. *Id.* Dr. Patterson's notes suggest that Corrigan was still taking both Percocet and Voltaren at this time. *Id.*

Upon a May, 1995 examination, Dr. Patterson assessed Corrigan as doing "worse". *Id.* at 438. Corrigan told Dr. Patterson that he was still walking about a mile per day, but that he was having trouble sleeping and was experiencing sharp, stabbing, increased pain over the last eight days. *Id.* Dr. Patterson noted that he was "overall about the same." *Id.* Dr. Patterson also assessed Corrigan was doing the "same" following another examination in September. *Id.* at 433. During this exam, Corrigan stated that he was hurting more overall and that he was sleeping terribly. *Id.* He stated that he was walking about one to two miles per day, but that any fast movement led to increased tightness with a longer recovery. *Id.* In November, Dr. Patterson mailed Corrigan a prescription for a cane to assist him in walking. *Id.* at 432. In January 1996, Dr. Patterson noted that Corrigan "felt lousy" that day and that he could no longer walk more than 100 yards. *Id.* at 429. Dr. Patterson further noted that Corrigan was doing worse overall, but that he could occasionally do dishes and light laundry. *Id.* Dr. Patterson recorded that his transfers were "slow and painful" and that he walked with a limp. *Id.*

On May 3, 1996, Dr. Saperstein re-evaluated Corrigan for the Department of Industrial Accidents. *Id.* at 313–16. Dr. Saperstein reported that Corrigan had continued to be disabled since the second operation. *Id.* at 313 He noted that since his last evaluation Corrigan had complained of increasing pain and that his activities are limited to driving and walking short distances. *Id.* at 314. Dr. Saperstein noted that he now walks with a

cane and a hesitating gait, and complains of aching in his right leg. *Id.* Straight leg raising is positive at about 70 degrees in the sitting position, and in the lying position is positive at 70 degrees on the right and 80 degrees on the left. *Id.* at 314–15. Forward trunk flexion was reported as limited to about 30 degrees. *Id.* at 314. The report indicates that he has no sensory deficit and no atrophy, and that his peripheral reflexes are depressed but present. *Id.* at 315. Dr. Saperstein determined that "the disability as described by me is total and permanent," and found a 30% disability of his low back based on the AMA Guidelines. *Id.* He further stated that prognosis for Corrigan's ability to return to the work atmosphere was poor, but noted that if Corrigan could be weaned from Percocet and was directed toward physical therapy and pain control, he may be trainable for sedentary work beginning only a few hours per day, a few days per week. *Id.* at 315–16. Dr. Saperstein concluded his report by stating that Corrigan appeared to be "somewhat worsened, in a worsened condition than that … presented to me in 1993." *Id.* at 316.

In August 1996, Corrigan visited Dr. Patterson again. *Id.* at 423. Corrigan stated that he had gone to vocational rehabilitation but that there were no jobs available. *Id.* Corrigan also said that he was walking, though slowly, up to one and one-half miles each day, though he was walking slowly. *Id.* Forward flexion improved to within sixteen inches from the floor. *Id.* He stated that he felt overall perhaps a little better, and Dr. Patterson assessed him as being "overall a little better than last year." *Id.* Dr. Patterson recommended that he gradually increase exercise. *Id.*

In December of 1996, Dr. Patterson reported that Corrigan's physical status was about the same, and that his emotional condition was worse. *Id.* at 421. His forward trunk flexion was now limited to 22 inches, worse than in August. *Id.* Corrigan complained of aching joints and of a sore back with periodic radiation down the right leg. *Id.* All bone scans and blood tests previously conducted by a rheumatologist were negative for inflammatory arthritis. *Id.* Dr. Patterson noted that he transfers with mild to moderate difficulty, and that he continued to wear his brace. *Id.* His final diagnosis was postlaminectomy syndrome with secondary depression. *Id.* Dr. Patterson restarted Corrigan on Trazadone to control his depression. *Id.*

In February of 1997, Dr. Patterson assessed that Corrigan's mental health was deteriorating. *Id.* at 417. He reported that his back was still sore with periodic radiation down the right leg. *Id.* As in December, 1996, Dr. Patterson again reported that he transferred with mild to moderate distress and that he wore a brace. *Id.* He was again diagnosed as having postlaminectomy syndrome with secondary depression, which Dr. Patterson concluded had worsened. *Id.* Dr. Patterson increased his Trazadone dosage and gave him samples of Naprelan. *Id.* He further stated that Corrigan should get an MRI and consider surgical consultation for a potential fusion. *Id.*

In April, 1997, Dr. Patterson reported that Corrigan "has not been doing that well, although he has responded to the medication." *Id.* at 414. Corrigan noted that he was sleeping better and was experiencing less muscle spasm. *Id.* He further noted that he had a numbness over many different parts of his body, seemingly associated with remaining in a stable position. *Id.* He also noted that he was experiencing some coldness in his extremities. *Id.* Dr. Patterson again reported that he was transferring with moderate distress and that he was wearing a brace, and he scheduled an MRI for that week.

*Id.* The MRI taken that week revealed degenerative changes at L4–5 and L5–S1, and a diffuse bulge at L4–5. *Id.*. at 375. Dr. Patterson said that the bulge at L4–5 could be the cause of Corrigan's problems, though he did not think it was likely. *Id.* at 413. Accordingly, he recommended that Corrigan seek further evaluation from a qualified back surgeon. *Id.*

On April 29, 1997, Dr. Patterson reported that Corrigan had done a little better since his visit earlier that month, but that Corrigan still felt that he was worse than the previous year. *Id.* at 410. Dr. Patterson noted that Corrigan reported difficulty walking even 50 yards, and that he was feeling numbness and coldness in both legs. *Id.* Corrigan also continued to experience intermittent radiation to his legs, more on the right than the left. *Id.* Forward flexion was measured at reaching 23 inches from the floor, and straight leg raising was positive in the supine position at 50 degrees on the right, 80 degrees on the left. *Id.*

In October, 1997, Corrigan again visited Dr. Patterson for a follow-up visit. *Id.* at 405. Corrigan told Dr. Patterson that he was doing a little bit better. *Id.* Specifically, Corrigan reported that he was walking up to one mile a day, that his mood was stable, and that he was sleeping reasonably well. *Id.* Corrigan himself cut back on the Trazadone and Naprelan, though he was still using the Percocet consistently. *Id.* Dr. Patterson reported that he moved and transferred a bit better than his last visit in April. *Id.* In the sitting position, straight leg raising was negative at 70 degrees bilaterally, while in the supine position straight leg raising was limited at 70 degrees bilaterally, which is slightly better than it was in April. *Id.* Dr. Patterson concluded that he had "somewhat improved" in comparison to the previous April, and he encouraged Corrigan to continue his self care. *Id.*

In November, 1997, Dr. Patterson wrote a letter to legal counsel explaining that Corrigan's clinical course has been fluctuating since August of 1993, which he said was consistent with postlaminectomy syndrome. *Id.* at 475. He also noted that the MRI taken the previous April revealed changes without evidence of recurrent disc herniation, which he stated was consistent with the reports of continued back pain and intermittent radicular pain. *Id.* Dr. Patterson opined that Corrigan has stable postlaminectomy syndrome that caused persistent pain which would prevent him from work "even of a limited nature". *Id.* at 476. He explained that continual pain would prevent him from performing work of a sedentary nature, and that his limited mobility would prevent him from performing work which required a mixture of standing, sitting, or walking. *Id.* Dr. Patterson also felt that fluctuation in his clinical course would likely result in Corrigan missing a substantial amount of work were work to be obtained. *Id.* He further stated, in response to inquiry, that he did not feel that Corrigan was physiologically dependent on Percocet, and that his use of the pain killer was reasonable and necessary. *Id.*

In December, 1997, Dr. Patterson wrote to the Medical Affairs Branch of the Registry of Motor Vehicles in response to Corrigan's request for a handicapped license. *Id.* at 403. He reported that Corrigan wore a back brace nearly all of the time, and that he required use of a cane to walk any meaningful distance. *Id.* He stated that Corrigan can walk up to one-quarter to one-half mile, stopping frequently. *Id.*

Corrigan's next visit to Dr. Patterson occurred in March 1998. *Id.* at 400. At that time, Corrigan reported that his condition was stable overall. *Id.* He felt that his emotional state had improved as a result of settling his insurance claim and

making plans for the future, but that he still felt like a wreck physically. *Id.* The report further stated that Corrigan continued to experience fairly constant pain with intermittent radiation down the legs. *Id.* In the supine position, straight leg raising was positive at 80 degrees with complaints of pain into the feet on both sides. *Id.* Forward flexion was reported at 22 inches from the floor, which Dr. Patterson felt was stable. *Id.* In conclusion, Dr. Patterson reported his overall condition as "stable" and recommended Corrigan come in for a follow up in five to six months. *Id.*

In June of 1998, Dr. Patterson wrote another letter to the Medical Affairs Branch of the Registry of Motor Vehicles. *Id.* at 398. This letter reported all of the same information as did the last letter, with only one slight difference. *Id.* In this letter, Dr. Patterson reported that Corrigan could only walk less than one-quarter mile with frequent stops, as opposed to the one-quarter to one-half mile as reported in the letter in December 1997. *Id.; see also id.* at 403.

Corrigan returned to Dr. Patterson for a follow up visit in November of 1998. *Id.* at 392. During this visit, Corrigan reported that he was stable overall. *Id.* Corrigan noted considerable back pain which he said did not radiate excessively into his legs. *Id.* His financial and social situation had stabilized in a positive manner, and he stated that he was sleeping okay. *Id.* He continued to use Percocet to control the pain, though he was not really taking the Naprosyn anymore. *Id.* In terms of mobility, he reported that he could not walk more than 100 yards per day. *Id.* He was still experiencing mild to moderate distress in transferring, which Dr. Patterson noted was about the same as his visit in March, 1998. *Id.* Straight leg raising was positive at 70 degrees, and is likewise limited to 70 degrees in the supine position. *Id.* Forward flexion was measured at sev-

enteen inches from the floor, which shows slight improvement. *Id.* Again, as with the March 1998 report, Dr. Patterson concluded that Corrigan's condition was stable overall. *Id.*

One year later, in November of 1999, Dr. Patterson again saw Corrigan for a visit. *Id.* at 377. The report indicated that the last year had been relatively stable for Corrigan, with periodic ups and downs. *Id.* In the couple months immediately preceding the visit, Corrigan had been experiencing considerably more pain than he had in the last few years. *Id.* He noted that he was walking up to 100 yards regularly, and with breaks he could walk approximately one-half to one mile, though not consistently. *Id.* He continued to use the Percocet for pain control, and noted that his use of Naprosyn and Paxil did not produce desirable results. *Id.* He reported that he was not sleeping well and that he continues to experience intermittent radiation down the right leg. *Id.* Straight leg raising was limited at 70 degrees, and in the supine position was limited at 70 degrees on the left and 60 degrees on the right. *Id.* Forward flexion was measured at twenty inches from the floor. *Id.* Dr. Patterson opined that Corrigan was at a medical end-point and that he should continue consultation with him once of twice a year. *Id.* at 377–78.

On July 21, 2000, Dr. Brickman, a consulting physician, examined Corrigan in accordance with a request by the hearing officer. *Id.* at 365; *see also* Pl.'s Mem. at 14. In his report Dr. Brickman concluded that Corrigan was "certainly disabled" and probably would continue to be "for some time." *Id.* at 366.

At the November, 2000 hearing, Dr. Caplan, a rheumatologist, was called to testify as a medical expert. *Id.* at 66–87. Dr. Caplan testified that Corrigan's back problems did not amount to an impairment as

listed in Listing 1.05C. *Id.* at 68. Dr. Caplan acknowledged the possibility that Corrigan's condition as revealed by documented MRIs and x-rays could cause pain, but opined that Corrigan's description of his pain was not properly focused on his leg pain or on specific patterns in order to support such a conclusion. *Id.* at 75–76. Based on medical records, Dr. Caplan concluded that Corrigan was suited to perform sedentary work as long as he was allowed to change positions throughout the day. *Id.* at 70–71. Dr. Caplan also stated that he did not feel that office notes and letters sent to the primary care doctor reflected Dr. Patterson's assessment in his November 1997 letter to legal counsel that Corrigan was not suited to perform work even of a sedentary nature. *Id.* at 83.

## III. Discussion

### A. Standard of Review

■ Review of a Social Security disability benefit determination by this Court is limited by section 405(g) of the Social Security Act, which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). "Substantial evidence exists when a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support the Commissioner's conclusion." *Musto v. Halter*, 135 F.Supp.2d 220, 225 (D.Mass. 2001) (quoting *Irlanda Ortiz v. Secretary of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir.1991)) (internal quotation marks omitted). The Commissioner must make credibility determinations and draw inferences from the record of evidence. *Id.* This Court must therefore affirm the Commissioner's decision "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodriguez Pagan v. Secretary of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir.1987). The findings of fact of the administrative law judge, however, are not conclusive when they are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.1999).

### B. The Medical Improvement Standard

■ Once a disability has been found, the Secretary may not terminate the benefits unless substantial evidence demonstrates that either a claimant has improved to the point of being able to engage in substantial activity, or the claimant's conditions was not as severe as originally thought. *Miranda v. Secretary of Health, Educ. and Welfare*, 514 F.2d 996, 998 (1st Cir.1975). The fact that a determination was made both to award and terminate benefits following the same proceeding is a distinction without significance. *Jones v. Bowen*, 679 F.Supp. 133, 135 n. 1 (D.Mass. 1988). Therefore, the hearing officer in this case, having found that disability existed for the closed period from September 21, 1988 to August 19, 1993, was required to justify termination of Corrigan's benefits after August 19, 1993 by substantial evidence demonstrating at least one of the two situations contemplated by the First Circuit in *Miranda.*

The hearing officer did not indicate anywhere in his decision that Corrigan's injury was not as serious as originally contemplated. R. at 18–34. Rather, the hearing officer relied on the determination that Corrigan was no longer disabled following August 19, 1993 within the meaning of the Social Security Act. *Id.* at 34.

■ Corrigan claims that the hearing officer failed to use a medical improvement standard in the latest hearing in which he determined that Corrigan was disabled and thus eligible for benefits for the closed period from September 21, 1988 to August

19, 1993. Pl.'s Mem. at 15–16. The Commissioner agrees that the medical improvement standard is appropriate when making a determination to terminate benefits, but argues that the hearing officer in fact did consider medical improvement. Def.'s Mem. at 13–14. Specifically, the Commissioner argues that, while the hearing officer primarily focused on whether Corrigan again became disabled after August of 1993, this was not erroneous because the hearing officer did address the issue of medical improvement. *Id.* at 13.

Under the regulations, medical improvement is defined as "any decrease in the medical severity of [an] impairment" determined by "changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the] impairment." 20 C.F.R. § 404.1594(b)(1). In order to find medical improvement, the Commissioner is required to compare prior and current medical evidence in order to evaluate any change in the condition of the impairment. *Id.* § 404.1594(b)(7). If medical improvement is found, the Commissioner must then determine whether the improvement has positively affected the claimant's ability to do work. *Id.* If so, the Commissioner must then establish that the claimant is able to engage in gainful activity before making a determination that the disability has ended. *Id.* § 404.1594(c)(3)(i). A specific eight-step evaluation process is laid out in the regulations to ensure uniformity in decisions to terminate benefits. 20 C.F.R. § 404.1594(f).[2]

There is no requirement that a decision strictly announce that it is going to use the medical improvement standard. Rather, the important question is whether the evaluation in the decision as a whole reflects consideration of medical improvement and its relation to ability to work, and whether a conclusion drawn from such consideration is supported by substantial evidence. *See, e.g., Woolfolk v. Comm'r of Soc. Sec.,* 89 Fed.Appx. 766, 768, 2004 WL 322685 (3d Cir.2004) (upholding the District Judge's ruling that although the hearing officer's analysis of medical improvement was not sequential, the analysis properly addressed the necessary elements)[3]; *Lew-*

---

2. The eight steps, as summarized by the hearing officer in the January 17, 1997 opinion, are as follows:

1) Is the individual engaging in substantial gainful activity?
2) Does the individual have an impairment which meets or equals the severity of an impairment found in the Listings?
3) Has there been medical improvement?
4) If there has been medical improvement, is it related to the individual's ability to do work?
5) Do any exceptions to the medical improvement standard apply?
6) Does the individual have a severe impairment or combination of impairments?
7) Can the individual do past relevant work?
8) If the individual cannot do past relevant work, can he or she do any other work?
R. at 341.

3. Third Circuit Local Rule 28.3(a) notes that parties may cite to unpublished opinions, though Third Circuit Internal Operating Procedures, Appendix I, 5.7 notes that these opinions are not precedential and announces that "[t]he court by tradition does not cite to its not precedential opinions as authority." In *Drinker v. Colonial Sch. Dist.,* 78 F.3d 859, 864 n. 12 (3d. Cir.1996), the Third Circuit noted that although unpublished opinions are not binding authority, an unpublished opinion of similar factual bases may nevertheless be persuasive "as a paradigm of the legal analysis [the Court] should ... follow."

Citation to unpublished opinions has been an issue of considerable debate, which continues quite vigorously today. The Eighth and Ninth Circuits are on extreme ends of the debate. *Anastasoff v. United States,* 223 F.3d 898, 899–905 (8th Cir.2000), *vacated as moot,* 235 F.3d 1054 (8th Cir.2000) (en banc) (holding that unpublished opinions have precedential effect); *Hart v. Massanari,* 266 F.3d 1155, 1163 (9th Cir.2001) (upholding its local rule prohibiting the citation of unpublished deci-

*is v. Barnhart,* 201 F.Supp.2d 918, 932) (N.D.Ind.2002) ("[E]ven though the ALJ did not precisely follow the order of the eight-step evaluation for closed periods of disability, this statement [of medical improvement] and his analysis of Lewis's residual function capacity indicates that the ALJ considered whether Lewis's medical improvement was related to his capacity to work.").

In the final decision now on appeal before this Court, the hearing officer erroneously frames his analysis explicitly around the five-step evaluation process generally used for initial applications. R. at 23; *see also* 20 C.F.R. § 416.920. The hearing officer makes not one reference to "medical improvement" throughout the opinion, but rather goes through the five-step evaluation process for making a determination of disability. While the Commissioner argues that the hearing officer uses the appropriate analysis by referring to his decision of January 17, 1997, Def.'s Mem. at 12–13, the hearing officer does no such thing. One sentence noting that the decision of January 17, 1997 "seems still convincing" hardly suffices to meet the requirement of employing the required eight-step analysis. *See id.* at 13.

In fact, a comparison of that prior decision with the one now before the Court clearly demonstrates that the hearing officer did not properly employ the required medical improvement analysis. In the January 17, 1997 decision, the hearing officer did use the medical improvement analysis in discussing the termination of benefits upon the date of August 19, 1993. R. at 322–46. In the earlier opinion, the hearing officer specifically lays out the eight-step evaluation process to be employed before terminating benefits and subsequently evaluates the claimant's condition before and after August 19, 1993 based on that process. *Id.* at 340–45. Specific language in the January 17, 1997 opinion further evinces the proper analysis while highlighting the lack of proper analysis in the opinion now before the Court. For example, in the previous opinion, the hearing officer noted that "medical improvement in his condition had taken place, and that this improvement was related to his ability to do work." *Id.* at 343. The hearing officer further speaks of how the "progressive and significant improvement" of the claimant's condition may have allowed him to regain "an ability to perform the full range of 'sedentary' work tasks . . . ." *Id.* No language of comparable relevance is found in the opinion presently before the Court.[4]

sions as constitutional); see also *Alshrafi v. American Airlines, Inc.,* 321 F.Supp.2d 150, 160 n. 9 (D.Mass.2004) for a more extensive review of the holdings in *Anastasoff* and *Hart.* For a more complete reflection of this debate, see Stephen R. Barnett, *In Support of Proposed Federal Rule of Appellate Procedure 32.1: A Reply to Judge Alex Kozinski,* Fed. Law., November/December 2004, at 32; Anne Coyle, Note, A Modest Reform: The New Rule 32.1 Permitting Citation to Unpublished Opinions in the Federal Courts of Appeals, 72 Ford. L.Rev. 2471 (2004); A Lawrence J. Fox, Note, *Those Unpublished Opinions: An Appropriate Expedience or an Abdication of Responsibility?,* 32 Hofstra L.Rev. 1215 (2004); Hon. Alex Kozinski, Letter, Fed. Law., June 2004,

at 37; Gary Young, *Cite, Publish or Perish?,* Nat'l L.J., May 3, 2004, at S1.
This Court considers the reasoning of *Anastasoff* especially compelling and thus will treat the holding of unpublished opinions as persuasive authority, as it has done in the past. *Giese v. Pierce Chem. Co.,* 43 F.Supp.2d 98, 103 n. 1 (D.Mass.1999) (relying on unpublished opinions' persuasive authority).

4. Due to the erroneous application of an improper analysis by the hearing officer, the Court need not now reach the question whether the decision to terminate benefits on the date specified was supported by substantial evidence.

## IV. CONCLUSION

Accordingly, this Court orders that the decision be Remanded to the Commissioner with an order to employ the medical improvement standard to determine whether Corrigan's benefits ought be terminated and, if so, upon what date.

SO ORDERED.